## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CEVA ANIMAL HEALTH, LLC**, a Kansas limited liability company, | ) ) ) | |
| | ) | Case No: _____ |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| **MUSTANG FLIERS, INC.**, a Florida corporation, and **JOHN DOES 1-10**, individually or as corporations/business entities, | ) ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. §§ 1114, 1125(A), AND RELATED STATE CLAIMS

Plaintiff Ceva Animal Health, LLC ("Ceva" or "Plaintiff"), brings this action against Defendants Mustang Fliers, Inc. and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement; (4) common law unfair competition; and (5) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Ceva's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Ceva's trademarks. In support of its Complaint, Ceva alleges as follows:

### PARTIES

1.    Ceva is a limited liability company, organized under the laws of Kansas, with its principal place of business located in Lenexa, Kansas.

2.      Defendant Mustang Fliers, Inc. ("Mustang") is a corporation organized under the laws of Florida.  According to corporate documents filed with the Florida Secretary of State, the sole officer of Mustang is Paul Butler and the principal place of business of Mustang is located at 2023 Evergreen Way SW, McChord AFB, WA 98439.  Mustang operates an online storefront on www.amazon.com ("Amazon") that is currently called "Eclipse Services" (the "Amazon Storefront") and an online storefront on www.ebay.com ("eBay") that is currently called "Mustang Fliers" (the "eBay Storefront").    The Amazon Storefront has a merchant ID of A28W13DUN6F4KT and can be accessed at https://www.amazon.com/sp?ie=UTF8&seller=A28W13DUN6F4KT.  The eBay Storefront has a seller ID of "mustangfliers" and can be accessed at https://www.ebay.com/str/mustangfliers. Mustang does business throughout the United States through both the Amazon and eBay Storefronts, including in Kansas.

3.      Mustang was voluntarily dissolved on September 11, 2023.  Under Florida law, however, Mustang can still be sued in its corporate name despite its dissolution.  *See* Fla. Stat. Ann. § 607.1405(2)(e) ("Dissolution of a corporation does not . . . [p]revent commencement of a proceeding by or against the corporation in its corporate name"); *Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11-CV-1529 (KMW), 2016 U.S. Dist. LEXIS 88850, at *8-9 (S.D.N.Y. July 8, 2016) (collecting cases and holding that "[i]n light of [Fla. Stat. Ann. § 607.1405(2)(e)] . . . Tretter's suit [against a dissolved corporation] is not barred, but in fact expressly permitted, by Florida law.").  Mustang continues to operate the Amazon Storefront and eBay Storefront and sell infringing products bearing Ceva's trademarks.

4.      Ceva believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The

true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Ceva. Therefore, Ceva sues these Defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Ceva will seek leave to amend this Complaint accordingly. If Ceva does not identify any such parties, it will dismiss these Defendants from this action.

<u>**JURISDICTION AND VENUE**</u>

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. Ceva's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Kansas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Kansas and established sufficient minimum contacts with Kansas by, among other things, advertising and selling substantial quantities of infringing products bearing Ceva's trademarks to consumers within Kansas through a highly interactive commercial website, with knowledge that Ceva is located in Kansas and is harmed in Kansas as a result of Defendants' sales of infringing products to Kansas residents. Defendants know that Ceva is located in Kansas, among other reasons, because they received cease-and-desist letters informing them that Ceva is located in Kansas and is harmed in Kansas by their unlawful actions. Ceva's claims arise out of Defendants' substantial and regular sales of infringing products bearing Ceva's trademarks to Kansas residents.

7.    Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Ceva and Its Trademarks

8.    Ceva researches, develops, and markets high-quality veterinary, vaccine, and health products for pets ("Ceva products").  Ceva allows its products to be sold to end-user consumers in the United States only by Ceva itself and by sellers who Ceva has expressly authorized to sell Ceva products ("Authorized Sellers").  These sellers include retailers and authorized veterinarian clinics.

9.    Ceva allows Authorized Sellers to sell Ceva products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Ceva Rules").

10.    Ceva devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Ceva products to end-user consumers exclusively through itself and its Authorized Sellers that are required to follow the quality controls and other requirements in the Ceva Rules, Ceva ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive markets for veterinary, vaccine, and health products for pets, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

11.    To promote and protect its brands, Ceva has secured the rights to numerous trademarks relating to its business that are registered with the United States Patent and Trademark

4

Office.   These trademarks include, but are not limited to: FELIWAY® (U.S. Trademark Registration Nos. 5,314,421; 2,189,709), ADAPTIL® (U.S. Trademark Registration Nos. 5,319,655; 4,004,586), VECTRA 3D® (U.S. Trademark Registration No. 3,571,569), CATEGO® (U.S. Trademark Registration No. 5,157,641), DOUXO® (U.S. Trademark Registration No. 3,297,625), THUNDERWORKS® (U.S. Trademark Registration No. 4,704,258), THUNDERSHIRT® (U.S. Trademark Registration No. 4,277,385), THUNDEREASE® (U.S. Trademark Registration No. 5,346,433), THUNDERWUNDERS ((U.S. Trademark Registration No. 5,712,741) and THUNDERLEASH® (U.S. Trademark Registration No. 4,456,484) (collectively, the "Ceva Trademarks").

12.    The registration for each of the Ceva Trademarks is valid, subsisting, and in full force and effect.

13.    Ceva actively uses, advertises, and markets all of the Ceva Trademarks in commerce throughout the United States.

14.    Consumers recognize the Ceva Trademarks as being associated with high-quality veterinary, vaccine, and health products for pets.

15.    The Ceva Trademarks are widely recognized by the general consuming public of the United States and Ceva is recognized as the source of products bearing the Ceva Trademarks.

16.    Due to the superior quality and exclusive distribution of Ceva's products, and because Ceva is recognized as the source of high-quality products, the Ceva Trademarks have substantial value.

**Online Marketplaces and the Challenge They Present to Ceva's Product Quality Controls**

17.    E-commerce retail sales have exploded over the past decade.  From 2013 to the end of 2023, the percentage of total retail sales in the United States that were completed through e-

commerce channels rose from 5.6% to 15.6%.  E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (March 1, 2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

18.    In 2023, consumers spent approximately $1.12 trillion on ecommerce sales, a 7.6% increase from 2022.  *See* Abbas Haleem, US ecommerce sales penetration hits new high, DIGITAL COMMERCE 360 (February 26, 2024), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

19.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

20.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

21.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

22.    It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray*

*market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.     It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.    *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

23.     Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

24.     For example, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."    Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.    The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."    *Id*. at 14-15, 38.    *See also* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019,

https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

25.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019,

26.     In its 2022 annual report to its shareholders, Amazon also admitted that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), available at https://ir.aboutamazon.com/annual-reports-proxies-and-shareholder-letters/default.aspx.  Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.  *Id.*

27.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers and their pets—particularly when, as here, a brand owner's products are injected into and ingested by pets.

28.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

29.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.

30.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

31.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

32.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

33.     Online product reviews significantly impact a brand's reputation.  Survey results show that 99.75% of United States consumers read reviews "at least sometimes" when they consider buying a new product online, and 45% will not purchase a product if there are no reviews available for it.  *Survey: The Ever-Growing Power of Reviews (2023 Edition)*, Power Reviews, https://www.powerreviews.com/research/power-of-reviews-2023/ (last visited Mar. 1, 2024).

34.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised.  However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Therefore, online consumers rely more on brand reputation and reviews.

35.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  Not only are consumers less likely to buy a product with negative reviews, websites like Amazon use algorithms to downgrade products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to further downgraded product placement.

### Ceva's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor-Quality Products From Unauthorized Sellers on Online Marketplaces

36.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

37.     Numerous consumers have written negative reviews of Ceva products being offered for sale by unauthorized sellers on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Ceva products low "ratings" and complained of receiving products that were damaged, defective, previously used, not sealed, and tampered with.

38.     For example, Defendants have sold on Amazon the Ceva product seen in the screenshot below:





39.    Consumers have left negative reviews of this product complaining that they received products that were used, damaged, or in previously opened packaging:













40.    Astonishingly, more than one customer complained that there were cockroaches in the packaging for this product on orders likely fulfilled by unauthorized sellers:





41.    Below is a screenshot of another Ceva product that Defendants have sold on Amazon:

12



42.    As seen in the following sample screenshots of customer reviews, consumers have left negative reviews after they received orders that were damaged, close to expiration, or in previously opened packaging:



43.    The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Ceva products listed on Amazon that Defendants have sold through

their Amazon Storefront.  These reviews harm the reputation and goodwill of Ceva and its brands because consumers around the world view and rely on these reviews, even when purchasing Ceva products offline.  Even when the text of a review makes clear that a problem was seller-caused, negative reviews still lower the average review score and search placement of Ceva products.

44.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Ceva Trademarks on Amazon and are not subject to Ceva's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Ceva products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Ceva Trademarks from Defendants.

**Ceva Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused By Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect From Ceva**

45.     The above reviews show how sales of poor-quality Ceva products disappoint Ceva's consumers and cause significant harm to the reputation and goodwill of Ceva and its brands.  To protect itself and consumers from these harms, Ceva implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Ceva itself sells to consumers.

46.     The goals of Ceva's quality control program are to minimize the likelihood that poor-quality products reach consumers and ensure that consumers who purchase Ceva products, including consumers who buy online and those that purchase in a brick-and-mortar setting, receive the high-quality products and services they expect from products sold under the Ceva name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Ceva Trademarks.

14

47.    Ceva's ability to exercise quality controls is particularly important for the products it sells because some of Ceva's products are ingested or inhaled by animals and there may be health and safety risks associated with products that have not been properly inspected, stored, or handled.

48.    Ceva abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

49.    Ceva's ability to exercise its quality controls is essential to the integrity and quality of Ceva products, as well as the value of the Ceva Trademarks and other intellectual property.

**Authorized Sellers May Sell Ceva Products Only Through Specific Channels and Must Adhere to Ceva's Quality Control and Customer Service Requirements**

50.    Ceva maintains strict quality controls over Ceva products by allowing Ceva products to be purchased by end-user consumers only from Ceva itself or from Authorized Sellers. Ceva's Authorized Sellers include "Authorized Distributors" and "Authorized Resellers."

51.    All of Ceva's Authorized Sellers are permitted to sell Ceva products only in certain channels and are required to abide by the Ceva Rules.  Thus, every Authorized Seller that sells Ceva products is subject to Ceva's quality control requirements.

52.    The Ceva Rules require Authorized Sellers to purchase Ceva products only from Ceva directly or from other Authorized Sellers, per the applicable policy.  This restriction ensures that the chain of custody can be established for all Ceva products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low-quality products from entering into the distribution chain.

53.    The Ceva Rules also limit to whom and where Authorized Sellers may sell Ceva products.  To prevent persons outside of Ceva's quality controls from acquiring and reselling Ceva products, the Ceva Rules prohibit Authorized Sellers from selling Ceva products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are

permitted to sell Ceva products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

54.    Given the many perils of unauthorized online sales as described above, Authorized Sellers are also permitted to sell Ceva products online only on websites that they themselves own and operate or, in certain circumstances, that are owned and operated by another Authorized Seller. Authorized Sellers are prohibited from selling Ceva products on any other website—including on any online marketplace website—unless they first apply for and receive written approval from Ceva.

55.    These restrictions are essential to Ceva's ability to exercise its quality controls over Ceva products because they prevent unauthorized sellers from obtaining and reselling Ceva products and allow Ceva to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Ceva can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Ceva is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

56.    In addition to restricting where and how Authorized Sellers can sell Ceva products, the Ceva Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Ceva products.

57.    To ensure that customers receive the genuine and high-quality products they expect from Ceva, the Ceva Rules require Authorized Sellers to inspect all Ceva products for any damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from their inventory. Authorized Sellers are prohibited from selling damaged or

defective products and are required to report any discovered defects to Ceva to assist it with identifying any product quality issues.

58.    Authorized Sellers must also regularly inspect their inventory for any products that are expired ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of Not-Current Products in accordance with instructions provided by Ceva.

59.    The Ceva Rules also require that Authorized Sellers store Ceva products in accordance with their labeled requirements and other further guidelines issued by Ceva. These requirements help ensure that Ceva products are stored properly and are not damaged prior to being shipped to the consumer.

60.    To avoid consumer confusion and ensure that customers receive genuine Ceva products, Authorized Sellers must sell Ceva products in their original packaging and are prohibited from relabeling, repackaging, diluting, or altering Ceva products or any accompanying label, literature, or safety-related information without Ceva's consent. Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

61.    Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Ceva products, including any serial number, UPC code, or other identifying information.

62.    The Ceva Rules give Ceva the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Ceva products, to ensure their compliance with Ceva's quality control requirements. During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of their sources of all Ceva products. If Ceva discovers that an Authorized Seller is failing to follow the Ceva Rules,

Ceva has the right to cease selling its products to the Authorized Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

63.    Authorized Sellers must also communicate all safety information to consumers and cooperate with Ceva with respect to any product recall or other consumer safety information dissemination effort conducted by Ceva regarding Ceva products.

64.    The Ceva Rules also require Authorized Sellers to provide various customer services to their customers.  For example, Authorized Sellers must familiarize themselves with the features of all Ceva products kept in their inventory so they can advise customers on the selection and safe use of Ceva products.  Authorized Sellers must also report to Ceva any customer complaint regarding a Ceva product, assist Ceva in investigating any such complaint, and help customers themselves contact Ceva's customer service if needed.

65.    Ceva's quality control and customer service requirements are legitimate and substantial and have been implemented so that Ceva can control the quality of goods manufactured and sold under the Ceva Trademarks, to protect consumers as well as the value and goodwill associated with the Ceva Trademarks.

66.    Ceva's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Ceva product they were considering buying was being sold by an Authorized Seller who is subject to Ceva's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Ceva's quality controls and over whom Ceva is unable to exercise its quality controls.

**Given the Flood of Poor-Quality Products Sold Online and Consumers'
Inability to Inspect Such Products Before Purchase, Ceva Imposes
Additional Requirements on Its Authorized Sellers Who Sell Online**

67.     As shown in the consumer reviews cited above (*see* ¶¶ 37-43, *supra*), Ceva

products sold online are more susceptible to quality and authenticity problems because consumers

cannot see products before buying them.   These problems are especially severe on online

marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized

seller and many sellers may share a single product listing page.   Given these heightened risks to

consumer satisfaction and the value of its Ceva Trademarks that are posed by online sellers, Ceva

imposes additional quality control requirements on all of its Authorized Sellers that sell Ceva

products online.

68.     The Ceva Rules allow Authorized Sellers to sell Ceva products to end-user

consumers online only through "Permissible Public Websites," "Veterinary Home Delivery

Platforms," and "Authorized Websites."   These rules allow Ceva to oversee all Authorized Sellers

who sell Ceva products online.

69.     A "Permissible Public Website" is a website that: (1) is operated by a Ceva

Authorized Reseller in the Authorized Reseller's own legal name or registered fictitious name,

(2) is not a third-party storefront on an online marketplace website; and (3) lists the Authorized

Reseller's mailing address, telephone number, and email address.   A "Veterinary Home Delivery

Platform" is a website or mobile application that: (1) is operated by a Ceva Authorized Distributor;

(2) is used to facilitate orders of Ceva products from end-user consumers who are direct customers

of a Ceva Authorized Seller that operates a veterinary clinic; and (3) requires customers to create

an account with the Authorized Seller veterinary clinic to be able to purchase Ceva products.

70.     Authorized Sellers must receive prior written approval from Ceva before they can

sell Ceva products on any website that does not meet the criteria of a Permissible Public Website

or Veterinary Home Delivery Platform.  To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Ceva products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Ceva that includes review of their business operating business record and online review history.  A website that Ceva permits an Authorized Seller to use through this process is called an "Authorized Website."

71.    Online marketplaces, including Amazon, do not qualify as "Permissible Public Websites" or "Veterinary Home Delivery Platforms" because they are operated by third parties rather than an Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Ceva and specifically approved to sell on an online marketplace.

72.    The Ceva Rules impose numerous additional requirements on Authorized Sellers who sell Ceva products on Permissible Public Websites, Veterinary Home Delivery Platforms, or Authorized Websites (collectively, "Authorized Online Sellers").

73.    For example, Authorized Online Sellers must use images of Ceva products that are provided or approved by Ceva and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Ceva product they do not carry in their inventory.

74.    The Ceva Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Ceva or another third party.  These requirements allow consumers of Ceva products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Ceva to protect the public from the sale of poor-quality

or counterfeit Ceva products because it allows for easy detection of an Authorized Online Seller that sells poor-quality or counterfeit goods.

75.     Authorized Online Sellers who sell Ceva products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Ceva.  At Ceva's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Ceva products.

76.     Unless otherwise approved by Ceva, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Ceva products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Ceva products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Ceva's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Ceva's quality controls.

77.     All websites where Authorized Online Sellers sell Ceva products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Ceva upon request; and (iii) cooperate with Ceva in investigating negative online reviews related to sales of Ceva products.

78.     The additional quality control requirements that Ceva exercises over online sales of its products are legitimate and substantial and have been implemented to allow Ceva to carefully

control the quality of Ceva products that are sold online and quickly address any quality issues that arise.

79.    Ceva's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Ceva products online receive genuine, high-quality Ceva products that abide by Ceva's quality controls.  Consumers purchasing Ceva products online would find it relevant to their purchasing decision to know whether a product they are buying is vended by Ceva or by one of its Authorized Online Sellers that is subject to, and abides by, Ceva's quality controls.

## Ceva Monitors and Audits Its Authorized Online Sellers
## To Ensure They Comply With Its Quality Control Requirements

80.    Ceva regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Ceva carries out its auditing and monitoring actions pursuant to an internal program called the Ceva Online Quality Control Auditing Program ("Auditing Program").

81.    As part of its Auditing Program, Ceva examines a rotating sample of Permissible Public Websites on a regular basis to ensure that the Authorized Online Sellers who sell through the websites are complying with the Ceva Rules.  During these examinations, Ceva checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Ceva or a third party; (iii) do not display any content that could be detrimental to the Ceva and its brands; (iv) do not make any representations regarding Ceva products that are misleading; (v) exclusively contain images of Ceva products and product descriptions that are supplied or authorized by Ceva and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

82.     Ceva also periodically inspects online reviews of Ceva products and Authorized Online Sellers that appear on Permissible Public Websites.  If Ceva discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality Ceva products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Ceva communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

83.     Ceva also periodically conducts a test purchase of a Ceva product from a rotating sample of Permissible Public Websites.  If Ceva discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Permissible Public Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Ceva communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

84.     If Ceva discovers that an Authorized Online Seller is selling Ceva products of poor quality or otherwise not adhering to Ceva's quality control or customer service requirements, Ceva may conduct an investigation to determine the source of the problem.  The Ceva Rules require that Authorized Online Sellers cooperate with Ceva's investigation, permit Ceva to inspect their facilities and records relating to Ceva products, and disclose all information about where they obtained Ceva products.  Based on what its investigation reveals, Ceva has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

**Genuine Ceva Products Come with Ceva's 60-Day Satisfaction Guarantee;**
**Products Sold By Defendants Do Not**

85.     Non-prescription Ceva products that are purchased from Ceva directly or from an Authorized Seller also come with Ceva's 60-day satisfaction guarantee (the "Satisfaction Guarantee").

86.     Under the Ceva Satisfaction Guarantee, a customer is able to receive a full refund of the purchase price of a Ceva product within 60 days of the original purchase date if the customer is dissatisfied with the product for any reason.  The complete terms of the Ceva Satisfaction Guarantee can be viewed on Ceva's brands' websites (for example, at https://us.feliway.com/pages/returns-policy) and are incorporated herein.

87.     Ceva extends the Ceva Satisfaction Guarantee only to products that were sold by Authorized Sellers.  Because products sold by unauthorized sellers are not subject to Ceva's quality controls and Ceva cannot ensure the quality of such products, the Ceva Satisfaction Guarantee does not cover Ceva products sold by unauthorized sellers, including Defendants.  The Ceva Satisfaction Guarantee specifically states that "because we are unable to control the quality of our products sold by unauthorized sellers . . . the Ceva 60-Day Satisfaction Guarantee is not available for products purchased from unauthorized sellers, including unauthorized internet sites."

**Defendants Are Not Authorized Sellers and Are Illegally Selling**
**Non-Genuine Products Bearing the Ceva Trademarks**

88.     Because the unauthorized sale of Ceva products over the Internet threatens the reputation and goodwill associated with the Ceva Trademarks, Ceva actively monitors the sale of its products online.

89.     In the course of this monitoring, Ceva discovered that high volumes of products bearing the Ceva Trademarks were being illegally sold on Amazon through a storefront that, at the time of discovery was called "Mustang Fliers."  The Amazon Storefront's name has since been

changed to "Eclipse Services."   Around this time, Ceva also discovered the related eBay Storefront, "Mustang Fliers," illegally selling products bearing the Ceva Trademarks.

90.     Through investigation, Ceva identified Mustang as the operator of both the Amazon Storefront and the eBay Storefront and the party that is responsible for the unlawful sale of products bearing the Ceva Trademarks through each storefront.   The Amazon Storefront specifically identifies Mustang as the "Business Name" of the operator of the storefront:

**Detailed Seller Information**

**Business Name:** Mustang Fliers
**Business Address:**
735 5th St
Box 4086
Tacoma
WA
98438
US

91.     Mustang is not an Authorized Seller of Ceva products and is not subject to—and does not comply with—the Ceva Rules or the quality controls that Ceva imposes on its Authorized Sellers.

92.     On January 10, 2023, March 2, 2023, September 8, 2023, and October 25, 2023, counsel for Ceva sent cease-and-desist letters to Mustang and Paul Butler, the sole officer of Mustang, via email and overnight mail.   Ceva's letters explained that Defendants are infringing the Ceva Trademarks by selling products through their Amazon Storefront and eBay Storefront that are materially different from genuine products sold by Ceva's Authorized Sellers and that are not subject to, do not abide by, and interfere with Ceva's quality controls.   Ceva's letters also explained that Defendants are tortiously interfering with Ceva's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are

not Authorized Sellers and who resell the products. The letters also informed Defendants that Ceva is located in Kansas, is harmed in Kansas as a result of Defendants' illegal sales of infringing products bearing the Ceva Trademarks, and that Defendants will be subject to personal jurisdiction in Kansas if Ceva files suit. Ceva's letters demanded that Defendants permanently cease selling products bearing the Ceva Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

93.    In early November 2023, Paul Butler mailed copies of cease-and-desist letters that had been received by Mustang to one of Ceva's attorneys. There were handwritten notes on the letters stating "BASELESS CLAIMS" and other remarks. Defendants have not otherwise responded to Ceva's cease-and-desist letters, have ignored the demands in Ceva's letters, and have continued to advertise and sell products bearing the Ceva Trademarks through their Amazon Storefront without any abatement.

94.    Defendants' disregard of Ceva's cease-and-desist letters and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

95.    Upon information and belief, through their storefronts on the highly interactive Amazon and eBay website, Defendants accept and fulfill orders from Kansas residents for products bearing the Ceva Trademarks and cause substantial quantities of infringing products bearing the Ceva Trademarks to be shipped to persons located in Kansas through the regular course of business.

96.    As of the time of filing, Defendants' Amazon Storefront is called "Eclipse Services" after it was previously called "Mustang Fliers." Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID

number" that does not change over time even if the formal "name" of a storefront is changed. The Merchant ID number for Defendants' Amazon Storefront is A28W13DUN6F4KT. Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.amazon.com//sp?seller=A28W13DUN6F4KT.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Ceva's Quality Control and Customer Service Requirements**

97.    Defendants, without authorization from Ceva, have sold—and continue to sell— products bearing the Ceva Trademarks through their Amazon Storefront and eBay Storefront. Defendants may also be selling products through additional channels that Ceva has not yet discovered and cannot discover until it is able to take discovery.

98.    Ceva has implemented quality control and customer service requirements throughout its authorized channels of distribution. The products sold by Defendants are not genuine Ceva products because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

99.    Ceva's quality control and customer service requirements are legitimate and substantial. As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Ceva has lost control of the quality of goods that bear its Ceva Trademarks.

100.    Defendants do not abide by Ceva's quality control requirements because they sell products on Amazon and eBay. Ceva does not allow any of its Authorized Sellers to sell Ceva products on Amazon or eBay unless they obtain Ceva's approval because of the goodwill and

consumer safety issues associated with uncontrolled sales on online marketplaces discussed above. *See* ¶¶ 17-35, *supra*.

101. Defendants also do not abide by Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not provided Ceva with their business information nor given Ceva an opportunity to vet them to determine if they meet Ceva's high standards for what it demands of its Authorized Sellers that it approves to sell Ceva products online through Authorized Websites. Instead, Defendants sell products online without Ceva's authorization or oversight.

102. Defendants also do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not disclosed to Ceva where they sell Ceva products online. Defendants also do not provide customer feedback to Ceva that relates to their sales of products bearing the Ceva Trademarks or cooperate with Ceva in investigating negative online reviews relating to their sales of products bearing the Ceva Trademarks, as Authorized Online Sellers are required to do. These actions prevent Ceva from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Ceva Trademarks.

103. Defendants do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they: (1) have not disclosed to Ceva where they acquire products that bear the Ceva Trademarks; and (2) have not given Ceva the right to audit and inspect their facilities and records. As a result, among other things, Ceva cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor-quality products; (iii) selling products only in official and unaltered Ceva packaging; (iv) improperly allowing products that have been returned or repackaged to be listed

as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers. Ceva also cannot obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

104.    Consumers on Amazon can leave reviews of sellers as well as products. Reviews of Defendants' "Eclipse Services" Amazon Storefront show that Defendants have sold numerous poor-quality products and are not in compliance with Ceva's authorized seller requirements.

105.    For example, customers have complained about deceptive business practices and receiving incorrect order from the "Eclipse Services" storefront. In response to these negative reviews, Defendants took the opportunity to harass their customers:

---

★☆☆☆☆    "This seller was horrible. When I made a choice to return my item they sent me a scathing email about my reason for return. They also threatened me saying they were opening an investigation with Amazon against me all due to me saying the package arrived too late. This was the most insane interaction I've ever had with a seller."
Read less

By Hecate on March 14, 2024.

"item arrived BEFORE expected date set in the order - cx claimed it arrived LATE - which is untrue. Returns for accurate reasons is policy of Amazon and all stores - and when cx files inaccurate claim, incorrect information, and then leave negative feedback for being pointed out - well, we cannot imagine why we are wrong? we did not file a false claim / mistake - but negative means no mistake -"
Read less

By Eclipse Services on March 15, 2024.

---

★☆☆☆☆    "Pricing said free delivery but price actually $10 more than market price. It is cheaper at a local store."

By E Hass on December 17, 2023.

"we tried to reach out to this customer over this feedback and was ignored - seems after more than 20 years online shopping, people still need to be reminded that "free" shipping is never "free" - it is built in to the price of item. leaving negative for this is like leaving negative feedback for a gas station for filling up car on the way to the store to buy the item yourself. cost $10 for postage"
Read less

By Eclipse Services on December 29, 2023.

---


"Terrible Seller! Purchase was to include 4 items, but only arrived with one. Item is not eligible for return or refund and seller will not respond to requests."

By Trey on March 19, 2021.

"seller not only responded, seller notified the buyer that the $8.59 was for one item - not four - customer was charged for one item, received for one item, and has now retaliated with negative weaponized feedback. customer demanded a refund without a return - wanting the item free - horrible experience for us too - but it is what it is. any item can be returned if you goto the post office & Send"
Read less

By Eclipse Services on March 21, 2021.


"It was not a proper package it was inside shopping bag"

By MAFIOSO on November 15, 2021.

"tried to contact cx over this issue -no response. we always wonder why people post fdbk w/o the entire issue, only slanted piece making things look worse. item was actually shipped in bag INSIDE A BOX - and the bag is not for protection, it is for placement.(keep the item from moving around inside the box) wonder why cx failed to mention the box? complain on item arriving safe? bought another too"
Read less

By Eclipse Services on November 24, 2021.

106.    Ironically, several of Defendants' responses to negative customer reviews acknowledges the import that consumers place on reviews submitted to Amazon:


"I ordered 2 , order arrived today, ONLY "AT A GLANCE 2023" RECEIVED. NIce product, but not a nice price when paying for 2 and getting one."

By TOM on February 6, 2023.

"Its always disappointing when people feel the need to hurt a company making a simple mistake - simple fix, but no communication with us - right to the negative - since so many do not post their positive the numbers become slanted and unrealistic - Our family owned store does all we can to make each customer happy - though mistakes happen - not sure if we deserved negative for a simple mistake."
Read less

By Eclipse Services on April 1, 2023.


"This is listed and sold as a two pack. Checking the shipping weight will be enough to show that only a single was sent. It's a smart play, I can't say this wasn't sent or received. I can't claim it was the wrong item. I can't even honestly say it was the wrong size. It was one of the two items in the correct size... Pretty sure it's fraud, but cleverly done with no real way to address."
Read less

By A-D on September 20, 2022.

"when buyers make fraud claims on amazon and amazon permits it - and will not remove it - the feedback becomes suspect and all should know it is wrong and not true - shipping shows the correct amount - but alas - wish the other 1000 successful transactions left positive to show real numbers and not these types of feedback - as we work hard to make customers happy"
Read less

By Eclipse Services on November 16, 2022.

107.    Reviews of the eBay Storefront are similar.  Customers have complained about unfulfilled orders and poor customer service.  Defendants have likewise harassed all customers that left negative reviews, disclaiming any responsibility:

🚫 Poor customer service. Item never shipped; and after an inquiry- I was refunded without a response. Unbelievable.

4***t (327★)
US $31.95

Past year

Reply from: mustangfliers. Left within past year.

item shipped / lost in transit / refund issued - always one customer that wants to leave negative for the post office short comings - we stand by our service, as tracking shows shipment - no replacement available in store - so had to refund - still got negative - wish all would leave negative to the entity doing the harm - and that in this case, is the post office - though cannot leave negative for them, only us - realistic is best....

🚫 NEVER SENT ORDER

t***a (2239★)

Past year

Reply from: mustangfliers. Left within past year.

envelope was returned for postage - instead of having buyer pay - the post office returned it to our store for postage due - so we sent it - but took days to return - making this customer unhappy - and leave negative - $11 order is not "never sent" as cannot stay in business like that - unhappy customers only have negative - and without evidence make claims that are false - this item was not only shipped, first class, it was returned - making this negative without merit - and weaponized -

🚫 AFTER WAITING NEARLY TWO WEEKS AND NOT RECEIVING MY ITEM, I SENT THIS SELLER A MESSAGE REQUESTING A REPLACEMENT. AFTER WAITING A DAY AND NOT HEARING BACK, I CONTACTED EBAY TO GET A REFUND. THE SELLER THEN SENT ME TWO MESSAGES, ONE OF WHICH BEING RATHER RUDE, SALTY AND ACCUSATORY, STATING: "Did you want us to send another one and have the first delivered so you have two?" AS A LONGTIME EBAY MEMBER, I DON'T APPRECIATE BEING SPOKEN TO IN THIS MANNER. EBAY REFUNDED MY MONEY AS MY ITEM NEVER ARRIVED.

e***o (private)
US $18.95
Verified purchase

More than a year ago

Reply from: mustangfliers. Left more than a year ago.

we did our best to interact with this buyer - especially since the item tracking shows movement to the destination - meaning we shipped it, then delayed, or address incorrect, so would we send another? No, unreasonable. If one had a problem the other may have the same issue - send another? cant make everyone happy - tho can never do so when buyers blame sellers for carrier delays and loss, as long time sellers, we wish buyers would blame carriers when at fault. would not wait for the trace.

🚫 I ordered this item over a month ago. I had received a notification that a shipping label had been created, but to date I have not received this - tracking info states that the shipping facility is still awaiting the package in order to ship it. I have messaged the seller and have not received a response either. Extremely unhappy.

j***x (8)
US $19.99
Verified purchase

More than a year ago

Reply from: mustangfliers. Left more than a year ago.

always that "one guy" that wants to distort the truth and file a false statement to deliberately hurt a seller - guess we should be happy as he is the only one on ebay we have found - buyer got the refund upon notification - afterall, how to get a refund without our store being "responsive" - so buyer just wants to say the worst things available without the benefit of the truth - over an item lost in the mail? (like that never happens) - our family store works hard to please - but cant always

108.    Ceva allows its products to be sold only by itself and by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

109.    These reviews, along with the numerous negative customer reviews of Ceva products that Defendants have sold, *see supra* ¶¶ 38-42, show that Defendants are not carrying out the quality control inspection, storage, or handling requirements that Ceva requires Authorized Sellers to follow for Ceva products.  Instead, Defendants are likely selling products bearing the Ceva Trademarks to consumers that are tampered with, not sealed, previously used, damaged, and defective.  These sales cause customers to write highly negative reviews of Ceva products that harm Ceva's reputation and hurt the placement of Ceva products in search results.  Likewise, Defendants' continued sales of products bearing the Ceva Trademark wrongfully implies that Defendants are authorized sellers, which is concerning given the poor customer service Defendants provide given the negative interactions with consumers.

110.    Defendants' failure to abide by the Ceva Rules prevents Ceva from exercising control over the quality of products Defendants sell bearing the Ceva Trademarks.  Unlike with its Authorized Online Sellers, Ceva cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

111.    Through their unauthorized use of the Ceva Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Ceva products.  In reality, however, the products sold by Defendants are materially different from genuine Ceva products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Do Not Come With the Ceva Satisfaction Guarantee**

112.    As set forth above, genuine Ceva products purchased from Ceva or Ceva's Authorized Sellers come with the Ceva Satisfaction Guarantee.  However, Ceva does not provide the Ceva Satisfaction Guarantee for products purchased from any other seller because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

113.    Because Defendants are not Authorized Sellers and are thus not subject to Ceva's quality control requirements, the products bearing the Ceva Trademarks that Defendants sell do not come with the Ceva Satisfaction Guarantee.

114.    Because the products Defendants sell do not come with the Ceva Satisfaction Guarantee, they are materially different from genuine Ceva products.

115.    The Ceva Satisfaction Guarantee is a material component of genuine Ceva products.  Consumers considering whether to purchase Ceva products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Ceva Satisfaction Guarantee.  Consumers who purchase Ceva products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Ceva stands behind the product, and that they can get a refund or product replacement if they are not satisfied.

116.    Defendants' unauthorized sale of non-genuine products bearing the Ceva Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Ceva products that come with the Ceva Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With
Ceva's Agreements With Its Authorized Sellers**

117.    As discussed, Ceva allows Ceva's products to be sold to end-user consumers only by itself and by Authorized Sellers.

33

118.    Ceva has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

119.    Defendants have sold and are continuing to sell a high volume of products bearing the Ceva Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers. Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

120.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

121.    Defendants have known that Ceva's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

122.    Defendants have known of this prohibition since at least March 2, 2023.  On that date, Ceva overnight mailed and emailed a cease-and-desist letter to Defendants explaining that Ceva has agreements with all of its Authorized Sellers that prohibit them from selling Ceva products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products.

123.    Ceva's letter also informed Defendants that, by purchasing Ceva products from an Authorized Seller for the purpose of reselling them, they are causing a breach of the agreement between Ceva and its Authorized Seller and are interfering with Ceva's agreements and business relationships.

124.    Ceva's March 2, 2023 letter also advised Defendants that if they continued to acquire products from Ceva's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Ceva's contracts and business relationships with its Authorized Sellers.

125.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

126.    In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

127.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Ceva Has Suffered Substantial Harm as a Result of Defendants' Conduct**

128.    As set forth above, the unauthorized sale of products bearing the Ceva Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Ceva brand.

129.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Ceva. As such, Defendants' ongoing sale of non-genuine products bearing the Ceva Trademarks harms Ceva and its brands.

130.    Ceva has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

131.    Ceva has also suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

132.    Ceva is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Ceva Trademarks, causing continued irreparable harm to Ceva's reputation, goodwill, relationships, intellectual property, and brand integrity.

133.    Additionally, Ceva is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

134.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

135.    Defendants' willful infringement of the Ceva Trademarks and continued pattern of misconduct demonstrate intent to harm Ceva.

### FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

136.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

137.    Ceva has secured the rights to each of the Ceva Trademarks.

138.    The Ceva Trademarks are registered with the United States Patent and Trademark Office.

139.    The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

140.    Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Ceva Trademarks without Ceva's consent.

141.    The products bearing the Ceva Trademarks that Defendants sell are not authorized for sale by Ceva.

142.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

143.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

144.    The products sold by Defendants are not, in fact, genuine Ceva products. The products sold by Defendants are materially different from genuine Ceva products because, among other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

145.    Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks, and caused significant damage to Ceva's business relationships.

146.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

147.    Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

148.    Furthermore, Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

149.    Ceva is also entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Ceva Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

150.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

151.    As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

152.    Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

153.    Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

154.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

155.     Furthermore, Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

156.     Ceva is also entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
#### Common Law Trademark Infringement

157.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

158.     Ceva has secured the rights to each of the Ceva Trademarks.

159.     The Ceva Trademarks are registered with the United States Patent and Trademark Office.

160.     The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

161.     The Ceva Trademarks are distinctive and widely recognized by the consuming public.  Ceva's products are sold and purchased by Ceva's network of Authorized Sellers throughout the United States, including in Kansas.

162.     Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in commerce for purposes of selling non-genuine products bearing the Ceva Trademarks in Kansas without Ceva's consent.

163.     Defendants' use of the Ceva Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by

39

Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

164.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

165.    The products sold by Defendants are not, in fact, genuine Ceva products.  The products sold by Defendants are materially different from genuine Ceva products because, among other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

166.    Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks, and caused significant damage to Ceva's business relationships.

167.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

168.    Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

169.    Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## FOURTH CAUSE OF ACTION
**Common Law Unfair Competition**

170.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.    As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

172.    Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

173.    Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

174.    Defendants' unauthorized sales of products bearing the Ceva Trademarks and unauthorized use of the Ceva Trademarks in advertising infringe the Ceva Trademarks and constitute unfair competition at common law.

175.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

176.    Ceva is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

177.    Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Existing Contracts and Business Relationships**

178.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

179.    Other than products that Ceva itself directly sells to consumers, Ceva products are sold to the public exclusively through Ceva's network of Authorized Sellers.

180.    Ceva has entered into valid and enforceable agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

181.    Defendants are not Authorized Sellers and have sold—and are continuing to sell— a high volume of products bearing the Ceva Trademarks on the Internet.  Ceva has also not itself sold any Ceva products to Defendants.

182.    Based on these facts, it is reasonable to infer that Defendants acquired the products they are selling at least in part from one or more of Ceva's Authorized Sellers.

183.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

184.    Defendants have known that Ceva's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

185.    Defendants have known of this prohibition, among other reasons, because Ceva informed Defendants of this prohibition in a cease-and-desist letter it emailed and overnight mailed to Defendants on March 2, 2023.

186.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants so that Defendants could unlawfully resell them.

187.    In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

188.    Ceva's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale.  Although Ceva does not yet know which specific Authorized Seller(s) have breached their agreements with Ceva—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Ceva's claim of tortious interference.

189.    Defendants are not parties to the contracts they caused Authorized Sellers to breach.

190.    Defendants' actions have caused injury to Ceva for which Ceva is entitled to compensatory damages in an amount to be proven at trial.

191.    The injury to Ceva is immediate and irreparable, as Ceva's reputation and relationships have been damaged among its consumers and Authorized Sellers.

192. Ceva is also entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Ceva's rights.

**PRAYER FOR RELIEF**

WHEREFORE, Ceva prays for relief and judgment as follows:

A. Judgment in favor of Ceva and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, punitive damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B. That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

    i) Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Ceva Trademarks;

    ii) Prohibiting the Enjoined Parties from using any of the Ceva Trademarks in any manner, including advertising on the Internet;

    iii) Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Ceva Trademarks;

    iv) Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any

products sold by them which contain the Ceva Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing the Ceva Trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Ceva's products, or any of the Ceva Trademarks;

vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Ceva Trademarks which associate Ceva's products or the Ceva Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)   Requiring the Enjoined Parties to take all action to remove the Ceva Trademarks from the Internet, including from the websites www.amazon.com and www.ebay.com;

viii)  Requiring the Enjoined Parties to take all action to remove, or cause to be removed, any customer reviews of products bearing Ceva's Trademarks that were sold by Defendants on third-party marketplace websites including, but not limited to, www.amazon.com and www.ebay.com; and

ix)    Requiring the Enjoined Parties to destroy or return to Ceva all products bearing the Ceva Trademarks in their possession, custody, or control.

C.     An award of attorneys' fees, costs, and expenses.

D.    Such other and further relief as the Court deems just, equitable, and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ceva demands a trial by jury on all issues so triable.

### DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Local Rule 40.2(a), Ceva designates Kansas City, Kansas as the place of trial for this matter.

Dated:  April 3, 2024                     Respectfully submitted,

                                          */s/ Sean W. Colligan*
                                          Sean W. Colligan, Kan. Bar  # 25727
                                          STINSON LLP
                                          1201 Walnut Street, Suite 2900
                                          Kansas City, MO 64106-2150
                                          Tel: (816) 691-3384
                                          sean.colligan@stinson.com

                                          ***Attorneys for Plaintiff Ceva Animal Health, LLC***

Of Counsel:

Martha Brewer Motley (OH Bar No. 0083788)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH  43215
Telephone:  (614) 464-6360
Email:  mbmotley@vorys.com

Stephan P. Laboy (OH Bar No. 103584)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
Telephone:  (614) 464-6403
Email:  splaboy@vorys.com

*Pro Hac Vice applications forthcoming*